IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

GAYE ELAINE JARZABEK,   )
          )
    Plaintiff   )
          )  Civil Action No. 07-409
   v.      )
          )
UPMC PASSAVANT HOSPITAL  )
          )
    Defendant.  )

## MEMORANDUM OPINION

**CONTI, District Judge**

   Gaye Elaine Jarzabek ("plaintiff" or "Jarzabek"), a former unit director for UPMC Passavant Hospital's critical care unit, initiated this gender-based discrimination and retaliation action against her former employer, defendant UPMC Passavant Hospital ("defendant" or "Passavant").

   Plaintiff asserts claims for (1) retaliation which violated Title VII of the Civil Rights Act of 1963, 42 U.S.C. §§ 2000e *et seq*. ("Title VII") (count one), (2) gender-based discriminatory actions which violated Title VII (count two), and (3) retaliation and gender-based discrimination under the Pennsylvania Human Relations Act, 43 PA. CONS. STAT. §§ 951, *et seq*. ("PHRA") (count three).

   After considering defendant's renewed motion for summary judgment (Docket No. 35), defendant's brief in support (Docket No. 38), plaintiff's brief in opposition (Docket No. 39), defendant's reply brief (Docket No. 42), the joint statement of material facts ("J.S.") (Docket No. 45), and the parties' other submissions, the court will grant defendant's motion for summary judgment with respect to plaintiff's claims for gender discrimination under Title VII and the

PHRA.  Defendant's motion for summary judgment will be denied with respect to plaintiff claims for retaliation under Title VII and the PHRA.

*Factual Background*

A.    **Introductory facts**

Plaintiff began her employment with defendant in April 2004 as unit director for Passavant's critical care units.  (J.S.Def. ¶ 1[1]; Plaintiff's Deposition ("Pl. Dep.") at 27.)  Upon plaintiff's hiring, Holly Lorenz ("Lorenz"), defendant's vice president of patient care and chief nursing officer, made clear that the leadership in the intensive care unit ("ICU") needed changed and believed plaintiff would bring about that change.  (Plaintiff's Declaration ("Pl. Decl.") ¶¶ 1-7.)

As a unit director, plaintiff was responsible for managing the daily operations of the nursing units in Passavant's medical and surgical intensive care units (respectively, "MICU" and "SICU").  (J.S.Def. ¶ 5; Pl. Dep. at 32; Cheryl Dodson's Declaration ("Dodson Decl.") ¶ 7.) Plaintiff's responsibilities included managing the budget, adjusting staffing assignments and coordinating staff scheduling, resolving complaints and facilitating patient safety and customer satisfaction within the units.  (J.S.Def. ¶ 7; Pl. Dep. at 32-34; Dodson Decl. at ¶ 8.)

Initially, plaintiff reported to Lorenz, until February 2006, when Lorenz promoted Cheryl Dodson ("Dodson") to clinical director of operations.  (J.S.Def. ¶¶ 2, 4; Pl. Dep. at 27-28; Dodson's Deposition ("Dodson Dep.") at 8.)  After February 2006, Dodson was in charge of evaluating plaintiff's job performance.  (Dodson Dep. at 89.)

---

[1] The Joint Statement of Facts consists of defendant's statement of material facts with plaintiff's answers, containing paragraphs 1-102 on pages 1-33, and plaintiff's statement of material facts with defendant's answers, containing paragraphs 1-93 on pages 33-64.  To avoid any confusion that could arise from the duplicative paragraph numbers, citations to the joint statement will be referenced as J.S.Def. or J.S.Pl. followed by the appropriate paragraph number.

**B.      Annual evaluations**

On October 8, 2004, Lorenz completed a six-month orientation performance evaluation of plaintiff and determined a rating of 2.78 out of 3.0.  (J.S.Def. ¶ 9; 10/8/2004 Performance Review, Pl.'s Ex. 21.)  A rating of 2.0 means "consistently meets expectations" and a rating of 3.0 means "consistently exceeds expectations."  (J.S.Def. ¶ 9; 10/8/2004 Performance Review, Pl.'s Ex. 21.)  The evaluation was meant to rate the employee on various job performance functions over a specified time frame, including, but not limited to, increasing patient satisfaction, maintaining financial and productivity standards in direct reporting areas, and enhancing relationships with physician groups and individuals.  (10/8/2004 Performance Review, Pl.'s Ex. 21.)

In April 2005, Dodson completed plaintiff's annual performance evaluation and determined plaintiff's rating was 2.6. (J.S.Def. ¶ 17; 4/17/05 Performance Review Pl.'s Ex. 35.)  Despite several critiques, Dodson commented that plaintiff was "well on her way" to improving relationships with physicians despite the strong personality differences between the ICU staff and doctors.  (4/17/05 Performance Review Pl.'s Ex. 35.)

In February 2006, defendant successfully opened a third ICU, the cardiothoracic intensive care unit ("CTICU"), within defendant's hospital.  (Pl. Decl. ¶ 11.)  Defendant attempted to open the CTICU in December 2005 when the plaintiff was absent on medical leave, but failed.  (Id.)  Lorenz and Dodson both informed plaintiff that the CTICU could not have opened without her leadership. (Id.)

On February 16, 2006, Dodson met with plaintiff and Lorenz to clarify expectations between Dodson and plaintiff.  (J.S.Def. ¶ 21; Dodson Decl. ¶¶ 20, 25.)  Plaintiff told Dodson

that, while plaintiff was on leave, she felt Dodson micromanaged plaintiff's units, whereas plaintiff operated the units in a more independent manner.  (Pl. Decl. ¶ 13.)  The meeting did not involve any discussion regarding plaintiff's job performance.  (Pl. Decl. ¶¶ 13-15.)

Dodson evaluated plaintiff in April 2006 and noted plaintiff's improvement since the February 2006 meeting, but plaintiff's overall performance rating still dropped to 2.4.  (J.S.Def. ¶¶ 23-26; Dodson Decl. ¶ 21-23.)  Included within the April 2006 evaluation was a co-worker feedback form, that collected information from optional reviews filled out by plaintiff's co-workers.  (4/4/06 Performance Review, Pl.'s Ex. 9.)  Based upon reviews completed by six of plaintiff's co-workers, plaintiff achieved performance scores between 4.3 and 5 for various categories, on a scale of 1 through 5.  (4/4/06 Performance Review, Pl.'s Ex. 9.)

## C.    Dr. Pellegrini and the sexual harassment incidents

Dr. Ronald Pellegrini ("Pellegrini") was a cardiac surgeon employed by University of Pittsburgh Physicians ("UPP"), and was an attending surgeon at defendant's hospital.  (J.S.Def. ¶ 84; Teresa Petrick's Deposition ("Petrick Dep.") at 24, 33; Pellegrini's Deposition ("Pellegrini Dep.") at 29.)  He would perform surgeries at defendant's hospital on a periodic basis.  (J.S.Def. ¶ 84.)  Pellegrini was not an employee of defendant.  (J.S.Def. ¶ 84; Petrick Dep. at 24, 33; Pellegrini Dep. at 29.)  Pellegrini was, however, one of defendant's highest dollar volume admitting physicians.  (J.S.Pl. ¶ 1; Petrick Dep. at 35-36.)  Kim Froehlich ("Froehlich"), a primary nurse coordinator, testified that Pellegrini had considerable power at defendant's hospital, and "whatever Dr. Pellegrini wanted, Dr. Pellegrini got."  (Froehlich's Deposition ("Froehlich Dep.") at 31.)

In May 2005, Amy Kennedy ("A. Kennedy"), the primary nurse coordinator, informed plaintiff that Pellegrini touched the breast of Tiffany Manno ("Manno"), a nurse in plaintiff's

unit, while fumbling around for her name badge.  (J.S.Def. ¶ 80; Pl. Dep. at 103-04.)  A few days

after that incident, Pellegrini allegedly touched the breast of Jackie Cerny ("Cerny"), another

nurse in plaintiff's unit, inside a patient's room.  (J.S.Def. ¶ 75; Pl. Dep. at 78-80.)  Cerny

reported the incident to Darlene Hills ("Hills"), one of her co-workers.  (Pl. Dep. at 78-81.)  Hills

told Shari Lennon ("Lennon"), the primary nurse clinician, about the incident, and Lennon

relayed the information to plaintiff.  (Id.)  Plaintiff reported both incidents to Lorenz, who in

turn, reported them to Gary Mignogna ("Mignogna"), defendant's vice president of human

resources.  (J.S.Def. ¶ 76; Pl. Dep. at 94-97; Mignogna's Deposition ("Mignogna Dep.") at 66-

67.)

      Mignogna contacted both Cerny and Manno regarding the incident with Pellegrini, and

only Cerny wanted to pursue a formal complaint.  (J.S.Def. ¶¶ 78, 81, 82; Mignogna Dep. at 67;

Pl. Dep. at 111-12.)  Mignogna prepared a formal report summarizing the findings of his

investigation but Mignogna never spoke to Pellegrini as part of the investigation.  (J.S.Def. ¶ 83;

Mignogna Dep. at 68-69.)  Instead, Mignogna forwarded his report to Pellegrini's superiors at

UPP.  (Petrick Dep. at 24, 33.)  Pellegrini's superiors, including UPP's president, Marshall

Webster, met with Pellegrini on June 1, 2005, and warned him that the alleged contact was

potentially harassing and told him not to engage in inappropriate behavior.  (J.S.Def. ¶ 86;

Pellegrini Dep. at 21-24, 28-29.)  Pelligrini blamed "issues with the nursing staff" and the

"environment" at Passavant for the allegations against him.  (Memo 7/20/05 Pellegrini

Counseling, Pl.'s Ex. 24; Pellegrini Dep. at 26.)  Pellegrini was not formally disciplined.  (Memo

7/20/05 Pellegrini Counseling, Pl.'s Ex. 24; Pellegrini Dep. at 29.)  Mignogna testified that in

over twenty years of work in human resources departments, he could not recall another reported

incident of sexual harassment in which he did not speak with the alleged accuser.  (Mignogna Dep. at 74-76.)

In February 2006, plaintiff informed Lorenz that Pellegrini "turned his back" on her.  (Pl. Dep. at 150-51.)  Lorenz told plaintiff that Pellegrini blamed her for the 2005 sexual harassment allegations.  (Id.)

On April 21, 2006, Karen Loscar ("Loscar"), a new nurse, asked plaintiff not to assign her to work in the CTICU, in part because of an incident where Pellegrini slid his hand from Loscar's lower back up to her neck, and then kept his hand on the back of her neck.  (J.S.Pl. ¶¶ 20, 21; Pl. Dep. at 119-20; 4/21/06 Loscar Notes, Pl.'s Ex. 25.)

On April 26, 2006, Froehlich witnessed an incident between Pellegrini and Jody Kennedy ("J. Kennedy"), a nurse.  (J.S.Pl. ¶ 22; Pl. Dep. at 125-26; Froehlich Dep. at 5, 13-15.).  Pellegrini, Froehlich, and J. Kennedy were discussing the effect a concave sternum, which was a condition J. Kennedy had, would have on open-heart surgery.  (Froehlich Dep. at 5-6.)  Pellegrini pulled J. Kennedy's shirt, touched her sternum, and stated he could still perform surgery on her.  (Id.)  Froehlich reported the incident to plaintiff.  (J.S.Pl. ¶ 22; Pl. Dep. at 125-26; Froehlich Dep. at 5, 13-15.)   Plaintiff questioned J. Kennedy about the incident and she confirmed the events happened, but J. Kennedy stated she did not want to pursue any further action and wanted the matter dropped.  (J.S.Pl. ¶¶ 23, 24; Pl. Dep. at 128-30.)  J. Kennedy said she was "afraid" to report the incident to Pellegrini and did not want to "make waves" because she liked working with hearts and Pellegrini was beginning to trust her.  (Pl.'s Dep. at 128-31.)  Froehlich testified that she hesitated in reporting the incident she witnessed, because she did not know what the repercussions would be against her.  (Froehlich Dep. at 31-33.)

The two incidents occurring in April 2006 involving Pellegrini led plaintiff to complain to Dodson in May 2006. (J.S.Pl. ¶¶ 1, 24; Pl. Dep. at 138-39.) Dodson was upset, and said that Pellegrini probably left Mercy Hospital and UPMC Presbyterian, two hospitals that Pellegrini previously worked for, because of this type of behavior. (Pl. Dep. at 138-39.) Plaintiff was instructed to raise the complaint with Lorenz, who in turn told plaintiff to discuss the situation with Mignogna. (J.S.Pl. ¶ 2; Pl. Dep. at 138-39.)

On May 11, 2006, Jarzabek met with Mignogna. (J.S.Pl. ¶ 25; Pl. Dep. at 139-40.) At the meeting, Mignogna instructed plaintiff to inquire whether Pellegrini's touching of J. Kennedy was welcomed by her. (J.S.Pl. ¶ 25; Pl. Dep. at 139-40.) Before plaintiff could follow-up with J. Kennedy, Mignogna spoke with J. Kennedy; she confirmed the incident occurred, but allegedly said it was "blown out of proportion." (Mignogna Dep. at 106-08.) Plaintiff was thereafter instructed not to speak to J. Kennedy. (Pl. Dep. at 141.) Either Mignogna or Lorenz told Teresa Petrick ("Petrick"), defendant's president, about the incident between Pellegrini and J. Kennedy. (J.S.Pl. ¶¶ 26, 27; Petrick Dep. at 66-68.) Petrick was later informed by Mignogna that the claims with regard to J. Kennedy were unsubstantiated. (J.S.Pl. ¶¶ 29, 30; Petrick Dep. at 72-73.)

No one informed Pellegrini that a complaint had been filed until J. Kennedy, one of the alleged victims of the April incidents, approached him on May 19, 2006. (Pellegrini Dep. at 5-6, 10-12.) J. Kennedy told Pellegrini that she was questioned about their encounter and asked whether she wanted to file sexual harassment charges. (Pellegrini Dep. at 6.) J. Kennedy mentioned to Pellegrini that plaintiff raised the allegation. (Id.)

Petrick believed plaintiff embellished the claims and tried to influence J. Kennedy to file a complaint against Pellegrini. (J.S.Pl. ¶ 31; Petrick Dep. at 128-29, 142-46.)

**D.      Meetings on June 1, 2006**

Lorenz received a letter from Pellegrini dated June 1, 2006, in which Pellegrini requested a change in leadership in the CTICU.  (Letter 6/1/06, Pl.'s Ex. 7.)  Pellegrini wrote, in part:

> I feel we are desperately in need of a managerial change in this unit.  I am not going to reiterate the individual points of deficiencies that have occurred, but I think the lack of leadership is persistent and it is further deteriorating as the magnitude of the intensity of care required in that unit continues.  I hope you can help me with this issue.

(Id.)

On June 1, 2006, plaintiff met with Dodson and Lorenz to advise plaintiff not to discuss sexual harassment with her staff; Lorenz told plaintiff that she lost her opportunity with Pellegrini, that Pellegrini blamed her for the 2005 sexual harassment allegations, and that Pellegrini wanted her gone.  (J.S.Def. ¶ 28, 32-35; Pl. Dep. at 60-61, 148-49.)

That same morning, Darlene Hills ("Hills") approached Petrick and Mignogna after an open staff meeting to discuss plaintiff's management style.  (J.S.Def. ¶¶ 29, 30; Petrick Dep. at 87-92.)  Hills stated that plaintiff would use a management technique of pulling nurses aside and degrading them.  (Hills Dep. at 10-13.)  Hills claimed that plaintiff used this technique on her on one occasion over one and one half years earlier.  (Id.)  Hills alleged there were morale issues and the ICU was having a hard time retaining nurses.  (J.S.Pl. ¶ 35; Petrick Dep. at 89.)  Petrick and Mignogna asked Hills to find other staff members who had similar concerns.  (J.S.Pl. ¶ 36; Hills Dep. at 28.)  It was not normal for nurses to bypass their supervisors to discuss issues with the president of the company.  (J.S.Pl. ¶ 35; Dodson Dep. at 140.)

After the meeting, Petrick and Mignogna met with Lorenz and Dodson.  (J.S.Pl. ¶ 37.1; Petrick Dep. at 101-02.)  Petrick expressed a desire to fire plaintiff and stated she wanted to fire her "right then and there."  (J.S.Pl. ¶ 38; Petrick Dep. at 104; Lorenz's Deposition ("Lorenz

Dep.") at 129.) Mignogna, however, suggested that defendant "do things in a very methodical approach." (J.S.Pl. ¶ 39; Lorenz Dep. at 131.) Petrick told Mignogna, Lorenz, and Dodson to "move forward very aggressively" and to prepare an "action plan." (J.S.Pl. ¶¶ 40; Petrick Dep. at 104-05.)

**E.      Thirty-day performance plan**

The management team decided to provide plaintiff with a written assessment of the concerns raised by her staff and supervisors. (J.S.Def. ¶ 55; Lorenz Dep. at 128, 131; Dodson Dep. at 138, 143-44.) Dodson conducted an investigation and met with various hospital personnel. (J.S.Def. ¶ 56; Dodson Dep. at 60-61, 144-58.) On June 8, 2006, defendant presented plaintiff with a Management Action Plan for Performance Improvement ("Management Action Plan" or "Plan"). (J.S.Pl. ¶ 41; 6/8/06 Plan, Pl.'s Ex. 8.) Dodson explained to plaintiff that the Plan was drafted in response to particular staff complaints. (J.S.Def. ¶ 62; Dodson Dep. at 166-67.) Under the Plan, plaintiff was provided a thirty-day time period in which she had to demonstrate improved performance. (J.S.Def. ¶ 55; Lorenz Dep. at 128, 131; Dodson Dep. at 138, 143-44.) As part of the Plan, the CTICU was removed from plaintiff's supervision, and placed under the supervision of Jill Zonker ("Zonker"), interim unit director. (J.S.Def. ¶ 63; Dodson Decl. ¶ 28-29.)

In preparing the Management Action Plan, Dodson testified that between June 1 and June 8, 2006 she met with Dr. Mark Provenzano ("Provenzano"), Dr. Tom Schauble, Dr. Steve Harris, Zonker, nurse Ruth Lipinski, A. Kennedy, and nurse Lynn Bergh ("Bergh"). (J.S.Pl. ¶ 45; Dodson Dep. at 60.) Dodson averred that A. Kennedy expressed concern over the morale in the ICU. (Dodson Dep. at 152-53.) Dodson stated she was told that plaintiff did not treat the ICU staff well, and that plaintiff would frequently intimidate nurses. (Dodson Dep. at 153-54.) A.

Kennedy asserted at her deposition, however, that she attempted to set up a meeting with Dodson in order to express her views about plaintiff, but that she could not arrange a meeting with Dodson until the day of plaintiff's termination, after defendant already decided to fire her. (A. Kennedy's Deposition ("A. Kennedy Dep.") at 29-31.) A. Kennedy knew management was "really coming down hard" on plaintiff, and A. Kennedy was upset that management was acting in such a manner without getting her opinion. (A. Kennedy Dep. at 30-32.) A. Kennedy did not tell Dodson that plaintiff treated her staff poorly, nor did she tell Dodson that plaintiff used intimidating tactics with her staff. (A. Kennedy Dep. at 32-33.)

In preparing the Plan, Dodson also met with Provenzano, the medical director of the ICU. (J.S.Pl. ¶ 51; Dodson Dep. at 60-61.) Dodson told Provenzano about the allegations and what she planned to do, and Provenzano commented "my interaction and experience with her, Mrs. Jarzabek, was different." (J.S.Pl. ¶ 52; Provenzano's Deposition ("Provenzano Dep.") at 30-31.) Provenzano never told Dodson that plaintiff needed to be put on the Plan. (J.S.Pl. ¶ 52; Provenzano Dep. at 30-31.) According to Provenzano, there was no need to put plaintiff on the Plan based on his experiences. (J.S.Pl. ¶ 52; Provenzano Dep. at 30-31.) Provenzano told Dodson he had a collegial relationship with plaintiff. (J.S.Pl. ¶ 54; Provenzano Dep. at 20.) Provenzano also told Dodson that plaintiff had done a good job and that none of the nurses ever raised any issues regarding plaintiff. (J.S.Pl. ¶ 54; Provenzano Dep. at 19.) Dodson asserted at her deposition that Provenzano said that the morale in plaintiff's unit "was not good." (J.S.Pl. ¶ 51; Dodson Dep. at 147.)

After plaintiff was informed about the Plan on June 8, 2006, Petrick and Mignogna met with eight out of the seventy nurses from plaintiff's staff, including Bergh, Maura Coyne ("Coyne"), Wendy (Piet) Kline, June Moore, Sandy Mowry ("Mowry"), Cara Osterwise

("Osterwise"), Jen Thomas, and Hills.  (J.S.Def. ¶ 38; J.S.Pl. ¶ 55; Mignogna Dep. at 126-30; Petrick Dep. at 117-22.)  Several of the nurses explained episodes of being reprimanded by plaintiff.  (J.S.Def. ¶¶ 39-47; Hills Dep. at 34-48.)  Each of the nurses expressed their concern about the direction of the unit.  (J.S.Def. ¶¶ 39-47; Hills Dep. at 34-48; Petrick Dep. at 122-29.)

Mowry was disciplined for disrespecting plaintiff on March 31, 2006.  (J.S.Pl. ¶57; Jarzabek 3/31/06 Notes of Mowry Meeting, Pl.'s Ex. 19.)  Coyne had a reputation at the hospital for having a bad attitude.  (J.S.Pl. ¶ 58; A. Kennedy's Deposition ("A. Kennedy Dep.") at 44.)  Bergh was a graduate nurse and plaintiff wanted her to become a registered nurse; Bergh felt this was strict of plaintiff.  (J.S.Pl. ¶ 59; A. Kennedy Dep. at 40.)   Osterwise did not want plaintiff hired.  (Pl. Decl. ¶ 7.)  Osterwise often complained about staffing in plaintiff's units.  (J.S.Pl. ¶ 60; A. Kennedy Dep. at 41-42.)

The next day, June 9, 2006, Mignogna presented Dodson a separation package to offer plaintiff, that plaintiff could accept if she preferred resigning rather than continuing on the Management Action Plan.  (J.S.Pl. ¶ 63; Mignogna Dep. at 143-44.)  Mignogna and Dodson presented the resignation package to plaintiff on June 12, 2006.  (J.S.Pl. ¶ 64; Mignogna Dep. at 142.)  The severance package included a waiver of plaintiff's right to challenge her termination in court.  (J.S.Pl. ¶ 63; Mignogna Dep. at 143.)

Plaintiff was terminated on July 7, 2006, for performance issues.  (J.S.Pl. ¶¶ 16, 17; Dodson Dep. at 240-42.)  According to Mignogna, on July 3, 2006, plaintiff took a "non-collaborative and confrontational approach" to an issue involving an on-call nursing administrator and a clinical coordinator.  (Mignogna Dep. at 163-65.)  That incident was a precipitating event that caused Dodson to decide to terminate plaintiff's employment before the end of the thirty-day time period under the Plan.  (J.S.Pl. ¶ 74; Mignogna Dep. at 165.)

Defendant claimed it internally used a written corrective action form to process plaintiff's termination, and that the form was never shown to plaintiff. (Dodson Dep. at 212, 215-16.) The form, however, stated "[e]mployee refused to sign 7/7/06." (Notice 7/7/06 Discharge, Pl.'s Ex. 14.) The reasons for firing plaintiff on the written corrective action form were performance issues, including "negligence, abuse, or discourtesy to a patient, visitor, co-worker, etc." and "unsatisfactory/unacceptable work performance or behavior." (J.S.Pl. ¶ 79; Notice 7/7/06 Discharge, Pl.'s Ex. 14.)

There is no evidence that any manager, besides plaintiff, complained about sexual harassment. (J.S.Def. ¶ 102; Pl. Dep. at 8, 63-64.) There is also no evidence that any male manager complained and was not fired. (J.S.Def. ¶ 102; Pl. Dep. at 8, 63-64.) All plaintiff's former responsibilities were assumed by females. (J.S.Def. ¶ 74; Pl. Dep. at 49.)

### *Standard of Review*

Federal Rule of Civil Procedure 56(c) provides that summary judgment may be granted if, drawing all inferences in favor of the nonmoving party, "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). A motion for summary judgment will not be defeated by the mere existence of some disputed facts, but will be defeated when there is a genuine issue of material fact. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). In determining whether the dispute is genuine, the court's function is not to weigh the evidence or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party. Id. at 249. The court is to draw all reasonable inferences in

favor of the nonmoving party. El v. Southeastern Pa. Transp. Auth., 479 F.3d 232, 238 (3d Cir.

2007) ("In considering the evidence, the court should draw all reasonable inferences against the

moving party."). The United States Court of Appeals for the Third Circuit has stated:

> [I]f there is a chance that a reasonable factfinder would not accept
> a moving party's necessary propositions of fact, pre-trial judgment
> cannot be granted. Specious objections will not, of course, defeat a
> motion for summary judgment, but real questions about credibility,
> gaps in the evidence, and doubts as to the sufficiency of the
> movant's proof, will.

Id. The court may consider any material or evidence that would be admissible or usable at trial

in deciding the merits of a motion for summary judgment. Horta v. Sullivan, 4 F.3d 2, 8 (1st Cir.

1993) (citing 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal

Practice and Procedure § 2721, at 40 (2d ed. 1983)); Pollack v. City of Newark, 147 F. Supp.

35, 39 (D.N.J. 1956), aff'd, 248 F.2d 543 (3d Cir. 1957) ("in considering a motion for summary

judgment, the court is entitled to consider exhibits and other papers that have been identified by

affidavit or otherwise made admissible in evidence").


*Discussion*

**I.**      **Gender-Based Discrimination Claims (counts two and three)**

    **A.**      **Burden-Shifting Framework**

In her complaint, plaintiff asserts claims of gender discrimination based upon both Title

VII (count two) and the PHRA (count three). The analysis required for adjudicating plaintiff's

claim under the PHRA is identical to a Title VII inquiry. Scheidemantle v. Slippery Rock Univ.,

470 F.3d 535, 539 n.5 (3d Cir. 2006); Goosby v. Johnson & Johnson Medical, 228 F.3d 313 (3d

Cir. 2000). This court will not will not separately address her claim under the PHRA.

Title VII prohibits discrimination in employment based upon gender. 42 U.S.C. § 2000e-2. The Supreme Court recognized that it is often difficult for a plaintiff to prove that an employer acted with conscious intent to discriminate. <u>See</u> <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973). One manner in which a plaintiff can meet this ultimate burden of persuasion is by demonstrating that an employer's stated reason for the challenged action is not the true reason, but rather was a pretext for unlawful discrimination. <u>Texas Dep't of Cmty. Affairs v. Burdine</u>, 450 U.S. 248, 253 (1981). In cases where there is no direct evidence of discrimination, the United States Court of Appeals for the Third Circuit applies the burden-shifting analysis set forth in <u>McDonnell Douglas</u>. <u>Barber v. CSX Dist. Servs.</u>, 68 F.3d 694 (3d Cir. 1995). Under this analysis, a plaintiff must first establish a prima facie case of discrimination. <u>Burdine</u>, 450 U.S. at 254; <u>McDonnell Douglas</u>, 411 U.S. at 802.

If the plaintiff successfully demonstrates a prima facie case of discrimination, the burden of production – but not the burden of persuasion – shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment decision. <u>Simpson v. Kay Jewelers Div. of Sterling, Inc.</u>, 142 F.3d 639, 644 n.5 (3d Cir. 1998). The defendant can satisfy this burden by offering evidence of a nondiscriminatory reason for its action. <u>Fuentes v. Perskie</u>, 32 F.3d 759, 763 (3d Cir. 1994). Once the defendant offers a legitimate, nondiscriminatory reason for the challenged conduct, the plaintiff has the ultimate burden of proving by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were pretext for discrimination. <u>Jones v. Sch. Dist. of Philadelphia</u>, 198 F.3d 403, 410 (3d Cir. 1999). The <u>McDonnell Douglas</u> burden-shifting analysis is applied to cases under Title VII. <u>See</u> <u>McDonnell Douglas</u>, 411 U.S. at 801-06.

**B.      Prima Facie Case**

Title VII was enacted to prohibit employers from discriminating against employees on several bases, including sex, with respect to compensation, terms, conditions, or privileges of employment. Burdine, 450 U.S. at 259. To state a claim for gender-based discrimination under Title VII, a plaintiff must show by a preponderance of the evidence that: (1) she was a member of the protected class; (2) she was qualified for the position; (3) she was subject to an adverse employment action despite being qualified; and (4) similarly situated non-protected members were more favorably treated. See, e.g., Saidu-Kamara v. Parkway Corp., 155 F. Supp. 2d 436, 440 (E.D. Pa. 2001). The burden of making this prima facie case is light. Burdine, 450 U.S. at 253.

The parties do not dispute that the first three elements are met here: (1) plaintiff, a woman, was a member of the protected class, (2) plaintiff was qualified for her position, because she was employed at Passavant for two years and defendant does not contest plaintiff's credentials, and (3) plaintiff was subjected to an adverse employment action – she was placed on the Management Action Plan and her employment was terminated.

With respect to the fourth element of the prima facie case, defendant argues plaintiff cannot identify any nonmembers of the protected class who were more favorably treated. Plaintiff's former responsibilities were assumed by other female employees. Also, there is no evidence that any manager complained about sexual harassment, other than plaintiff. Plaintiff did not respond to defendant's argument with respect to the fourth element of her prima facie case.[2]

Viewing all evidence in the light most favorable to plaintiff, no reasonable jury could find that members not of the protected class were more favorably treated. Summary judgment

---

[2] In defendant's reply brief, it notes that plaintiff appears to have abandoned its discrimination claims, because plaintiff did not come forth with facts or arguments in response to defendant's summary judgment motion with respect to those claims.

must be granted in defendant's favor with respect to plaintiff's claims of gender discrimination under Title VII and the PHRA.

## II.     Retaliation Claims (counts one and three)

### A.     Prima Face Case

In addition to asserting gender discrimination claims under Title VII and the PHRA, plaintiff also asserted retaliation claims under Title VII (count one) and the PHRA (count three). The same standards, decisional law, and analysis apply to retaliation claims under both statutes. Slagle v. County of Clarion, 435 F.3d 262, 265 n.5 (3d Cir. 2006).

> The anti-retaliation provision of Title VII provides:
>
>> It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a). Retaliation claims brought under Title VII follow the burden-shifting framework established in McDonnell Douglas. See Jalil v. Avdel Corp., 873 F.2d 701, 706 (3d Cir. 1989). In order to establish a prima facie case of retaliation, plaintiff must demonstrate that: (1) she engaged in protected activity; (2) her employer took adverse action after or contemporaneous with her protected activity; and (3) a causal link exists between her protected activity and the employer's adverse action. Abramson v. William Patterson College of N.J., 260 F.3d 265, 286 (3d Cir. 2001).

### 1. Protected Activity

The first prong of the prima facie case requires, at the very least, an informal protest of discriminatory employment practices. Barber v. CSX Dist. Servs., 68 F.3d 694, 701-02 (3d Cir. 1995). The protest, in whatever medium, must specifically relate to the protected conduct

allegedly being infringed.  <u>Barber</u>, 68 F.3d at 701.  For purposes of defendant's motion for summary judgment, defendant does not dispute that plaintiff engaged in protected activity when she complained about sexual harassment of the nurses on her staff.  Plaintiff raised complaints of sexual harassment in May 2005 and May 2006.

### 2. Adverse Employment Action

The term "adverse employment action" in the context of retaliation claims traditionally was understood to refer to a "significant change in employment status, such as hiring, firing, failing to promote, reassignment, or a decision causing a significant change in benefits."  <u>Weston v. Pennsylvania</u>, 251 F.3d 420, 430-31(3d Cir. 2001); <u>see</u> <u>Pennsylvania State Police v. Suders</u>, 542 U.S. 129 (2004) (holding that under Title VII, a hostile work environment or constructive discharge may serve for adverse action).  The United States Supreme Court, however, in <u>Burlington Northern & Santa Fe Railway v. White</u>, 548 U.S. 53 (2006), interpreted the anti-retaliation provisions of Title VII not to be limited to the traditional employment-related actions listed above.  <u>Id.</u> at 67-69.  In this case, there is no dispute that the alleged retaliatory action, plaintiff's termination, fits within the traditional test for adverse employment actions.

### 3. Causal Connection

Defendant argues that plaintiff cannot establish a prima facie case of retaliatory discharge because she cannot establish a causal connection between the protected activity and the discharge.  With respect to the existence of a causal link between the plaintiff's protected activity and the employer's adverse action, two main factors are relevant: (1) timing and/or (2) evidence of ongoing antagonism.  <u>Abramson</u>, 260 F.3d at 288 ("Temporal proximity . . . is sufficient to establish the causal link. [A] plaintiff can [also] establish a link between his or her protected

behavior and subsequent discharge if the employer engaged in a pattern of antagonism in the intervening period.").

In the first prong, there must be a close temporal proximity between the protected activity and the adverse employment action.  Id.  While the court of appeals has not enumerated a stringent formula for what is considered to be too long of a gap between the protected activity and adverse action, the courts have held that a time span of several months is too great.  See Williams v. Philadelphia Hous. Auth., 380 F.3d 751, 760 (3d Cir. 2004) (two months too long to permit an inference of causation); George v. Genuine Parts Co., No. 04-108, 2007 U.S. Dist. LEXIS 5373, at *34-35 (W.D. Pa. Jan. 25, 2007) (finding that though suggestiveness is highly sensitive to the facts of each case, a three-month gap "is not so close as to be unusually suggestive of retaliatory motive, especially where an obvious and unimpeached non-retaliatory motive exists").

The United States Court of Appeals for the Third Circuit has been somewhat ambivalent with respect to whether timing alone is sufficient to satisfy the causation prong of the prima facie case. See Woodson v. Scott Paper Co., 109 F.3d 913, 920 (3d Cir. 1997) ("Temporal proximity between the protected activity and the termination is sufficient to establish the causal link."); Jalil, 873 F.2d at 701 (causal link established where plaintiff discharged two days following employer's receipts of the plaintiff's EEOC claim); but cf. Krouse v. American Sterilizer Co., 126 F.3d 494, 503 (3d Cir. 1997) (causation prong not established on timing alone where nineteen months passed following protected activity and adverse employment action: "[e]ven if timing alone could ever be sufficient to establish a causal link, we believe that the timing of the alleged retaliatory action must be 'unusually suggestive' of retaliatory motive before a causal link will be inferred."); Quiroga v. Hasbro, Inc., 934 F.3d 497, 501 (3d Cir. 1991) (affirming

lower court's determination that the timing of the plaintiff's discharge alone did not raise an inference of retaliation).  Timing, however, in connection with other types of suggestive evidence, is clearly sufficient to demonstrate the causal link.  Farrell v. Planters Lifesavers Co., 206 F.3d 271, 280-81 (3d Cir. 2000).  For example, the court of appeals held that timing combined with evidence of vague or inconsistent reasons given by an employer for an employee's termination was sufficient to satisfy the causation prong of the prima facie case. Abramson, 260 F.3d at 289 ("[h]ere, as we found in our discussion of the discrimination claim, [plaintiff] has succeeded in both casting doubt on the reasons [her employer] proffered for her termination, and in demonstrating that those reasons were vague and inconsistent"); see EEOC v. L.B. Foster Co., 123 F.3d 746, 753-54 (3d Cir. 1997), cert. denied, 522 U.S. 1147 (1998) (citing Waddell v. Small Tube Prods., Inc., 799 F.3d 69, 73 (3d Cir. 1986)).

In this case, plaintiff argues that the unusually suggestive proximity between the protected activity and the adverse action is sufficient itself to establish the causal connection. Plaintiff argues that, eight to ten days after Pellegrini and Petrick learned about Jarzabek's May 2006 complaints concerning Pellegrini's conduct, Pellegrini demanded plaintiff be fired and Petrick expressed a desire that she be fired.  Plaintiff asserts that the Court of Appeals for the Third Circuit has held that the temporal proximity analysis looks to the time span between the protected activity and the action by the employer that sets in motion the events leading to the adverse employment action.

In Marra v. Philadelphia Housing Authority, 497 F.3d 286, 305 (3d Cir. 2007), an employee was fired nine months after engaging in protected activity.  The court of appeals held that, in assessing causation, the jury could reasonably infer from the evidence that the employer resolved to terminate the employee four months after the activity, and that the formal termination

process took an additional five months to be completed. Id. Here, the combination of all the evidence – including the placement of plaintiff on the Management Action Plan, the offering of the severance package a day later, and plaintiff's termination less than one month after being placed on the Plan – is sufficient to support a finding by a reasonable factfinder that defendant resolved to terminate her in early June 2006. A reasonable jury could conclude that plaintiff's discharge did not occur until July, 2006, due to the formal termination procedure defendant undertook. The court notes that in responding to Petrick's desire to fire plaintiff, Mignogna, a member of defendant's human resources department, suggested that defendant take a methodical approach. The creation of the Plan could be considered a mere formality, especially in light of Pellegrini's letter asking for a change of management and Froehlich's deposition testimony that "whatever Dr. Pellegrini wanted, Dr. Pellegrini got." (Froehlich Dep. at 31.)

Even if timing alone is insufficient to establish causation, plaintiff presented sufficient additional evidence that defendant took adverse action against her following the protected activity. Plaintiff presented evidence of antagonistic behavior. The evidence that Petrick said she wanted to fire plaintiff "right then and there" on the same day that Pellegrini made his request that plaintiff be fired is strong evidence of antagonism in direct response to her protected activity. (Lorenz Dep. at 129.) Petrick instructed the human resources department to "move forward very aggressively" with respect to Jarzabek. (Petrick Dep. at 104-05.) Furthermore, plaintiff presented evidence that one day after being placed on the Management Action Plan, she was offered a separation package. Viewed collectively, this additional evidence overcomes "any doubts raised by the temporal separation" of the protected activity and the adverse employment action. Weston, 251 F.3d at 432.

Plaintiff adduced sufficient evidence demonstrating a genuine issue of material fact with respect to whether a causal link exists between her protected activity and the termination of her employment. The court concludes a reasonable jury could find plaintiff established a prima facie case.

**B.      Burden-Shifting**

Once a plaintiff has established a prima facie case, the burden shifts to the defendant to rebut the presumption of retaliation by producing evidence that the adverse employment action against the plaintiff was taken for reasons that are legitimate and nondiscriminatory. Delli Santi v. CNA Ins. Cos., 88 F.3d 192, 199 (3d Cir. 1996). An employer satisfies its burden of production by introducing evidence which, taken as true, would permit the conclusion that there was a reason that was not discriminatory for the adverse employment decision. Fuentes, 32 F.3d at 736; see generally St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 509 (1993). It is not necessary for the defendant to persuade the court that it was actually motivated by the reason which it offers. Burdine, 450 U.S. at 254; Bd. of Trs. of Keene State Coll. v. Sweeney, 439 U.S. 24, 25 (1978).

Defendant offered that the reason for its termination of plaintiff's employment was poor performance due to plaintiff's gross mismanagement of her units and her failure to work collaboratively with the staff and her peers. Defendant argues its legitimate business reason is evidenced by performance evaluations, which demonstrate a pattern of declining performance. Many of the issues with respect to plaintiff's performance were also raised by plaintiff's own staff, who came forward in June 2006 to express concerns. Defendant argues it offered plaintiff a final opportunity to demonstrate improvement under the Management Action Plan, but plaintiff could not achieve the necessary improvement.

Plaintiff argues that defendant's alleged reason for terminating her employment is vague, because defendant uses undefined terms such as "key issues," "mismanagement," "unsatisfactory job performance," not "being collaborative," and not working "with her unit director peers."

Recognizing that the burden on defendant is light, and defendant can satisfy this burden "by introducing evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision," Fuentes, 32 F.3d at 763, the court is satisfied that defendant set forth a legitimate, nondiscriminatory reason for the adverse employment action taken against plaintiff. Plaintiff's arguments are more appropriately addressed in the third part of the McDonnell Douglas framework.

## C.    Pretext

The last part of the analysis requires that, "[o]nce the employer answers its relatively light burden by articulating a legitimate reason for the unfavorable employment decision, the burden of production rebounds to the plaintiff, who must now show by a preponderance of the evidence that the employer's explanation is pretextual (thus meeting the plaintiff's burden of persuasion)." Fuentes, 32 F.3d at 763. Once the employer has stated a legitimate, nondiscriminatory reason for the adverse employment action, the plaintiff in order to survive summary judgment must satisfy at least one of the two prongs articulated by the United States Court of Appeals for the Third Circuit in Fuentes:

> [T]he plaintiff must point to some evidence, direct or circumstantial, from which the fact-finder could reasonably either (1) disbelieve the employers articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.

Id. at 764.

### 1. Prong One

A plaintiff must submit evidence that could cause a reasonable factfinder to discredit the employer's articulated reason for the adverse employment action in order to overcome summary judgment and bring her case to trial. To discredit the employer's articulated reason, the plaintiff does not need to produce evidence that necessarily leads to the conclusion that the employer acted for discriminatory reasons, Sempier v. Johnson & Higgins, 45 F.3d 724, 728 (3d Cir. 1995), nor produce additional evidence beyond her prima facie case. Fuentes, 32 F.3d at 764. A plaintiff must, however, demonstrate such:

> weaknesses, implausibilities, inconsistencies, incoherencies [sic], or contradictions in the employer's proffered legitimate reasons [such] that a reasonable factfinder could rationally find them "unworthy of credence" and hence infer that the proffered nondiscriminatory reason "did not actually motivate" the employer's action. [Fuentes, 32 F.3d] at 764-65 (quoting Ezold v. Wolf, Block, Schorr, and Solis-Cohen, 983 F.2d 509, 531 (3d Cir. 1992))**.**

Simpson, 142 F.3d at 644.

The question asked in prong one of the Fuentes test is not whether the employer made the best, or even a sound, business decision; it is whether the real reason for the adverse result suffered by the plaintiff is discrimination. Keller v. Orix Credit Alliance, 130 F.3d 1101, 1109 (3d Cir. 1997). The court is neither permitted to get involved in the subjective business decisions of the employer, nor set its own standards for the employer, unless there is evidence of discrimination. Ezold, 983 F.2d at 527. "An employment decision that would create a problem under prong one will likely turn on whether the stated reason for [adverse employment action] is so implausible that a fact-finder could not believe it to [be] worthy of credence." Orenge v. Veneman, No. 04-297, 2006 WL 2711651, at *15 (W.D. Pa. Sept. 20, 2006); see Menta v. Cmty. Coll. of Beaver County, 428 F. Supp. 2d. 365, 374 (W.D. Pa. 2006). An example of a stated

reason that a factfinder could find implausible and beyond belief was set forth in <u>Brewer v. Quaker State Oil Ref. Corp.</u>, 72 F.3d 326 (3d Cir. 1995).  The employer stated the reason for terminating the employee was because his sales performance was deficient, but the evidence on the record demonstrated that the terminated employee was the leading salesperson in the region. <u>Id.</u> at 330-32.

In the instant case, defendant argues that plaintiff offered no evidence to establish pretext. Defendant argues plaintiff did not present evidence suggesting that defendant fabricated its stated nondiscriminatory reason or that defendant's stated reason is plainly wrong.  In response, plaintiff argues that defendant manufactured its legitimate, nondiscriminatory reason to hide its real motivation for terminating plaintiff's employment.  Plaintiff argues that defendant concocted stories to support its alleged reason.  Plaintiff argues defendant created an action plan as part of a cover-up.  Plaintiff argues that defendant asserts that she never improved her performance as a manager during her time employed at defendant, but it was not until she complained about sexual harassment that the criticism turned into a basis for taking adverse action.

In support of its legitimate, nondiscriminatory business reason for terminating plaintiff's employment, defendant argues that sometime between June 1 and June 8, 2006, A. Kennedy expressed concern to Dodson regarding the ICU environment.  Dodson was allegedly told that plaintiff did not treat the ICU staff well, and that plaintiff would frequently intimidate nurses. Plaintiff presented evidence, however, that A. Kennedy never spoke to Dodson until the day of plaintiff's termination.  Defendant argues it only needs an honest belief that the information it relied upon is true, and that it is irrelevant whether the statement is truthful.  <u>See, e.g.,</u> <u>Keller</u>, 130 F.3d 1109; <u>Abramson</u>, 260 F.3d at 283; <u>Fuentes</u>, 32 F.3d at 765.  Plaintiff presented evidence, however, that the alleged statement from A. Kennedy was not made to Dodson, and for

that reason presented evidence that that the statement could not have been relied upon by defendant for its actions.

In addition to the alleged concerns of A. Kennedy and other staff members, defendant points to the complaint raised by Hills on June 1, 2006 as evidence that its motivation for terminating plaintiff's employment was based upon her performance. Plaintiff argues, however, that Hills' complaint is suspect. Hills raised the complaint to Petrick and Mignogna on June 1, 2006, the same day Pellegrini wrote the letter asking for plaintiff to be replaced. Petrick and Mignogna instructed Hills to solicit other staff members who disliked plaintiff's management style. The instruction, plaintiff argues, could be considered evidence of an effort to gather after-the-fact support for its decision to terminate plaintiff, which was made in response to Pellegrini's demand, after plaintiff's May 2006 complaint.

Plaintiff contends that defendant fabricated its legitimate, nondiscriminatory business reason as a cover-up for its decision to terminate plaintiff, and that evidence of such a fabrication entitles a finder of fact to conclude the business reason is pretextual. Plaintiff cites <u>Lawrence v. National Westminster Bank New Jersey</u>, 98 F.3d 61 (3d Cir. 1997), in support of its contention.

In <u>Lawrence</u>, a former employee sued his employer, claiming age and handicap discrimination. During his employment, the employee sustained back injuries in a June 30, 1987 car accident. After the accident, the employee returned to work. <u>Id.</u> at 64. On September 3, 1993, at the age of sixty, the employee was terminated. The employer asserted that he was terminated for substandard performance and "behavior not befitting a manager"; the employee contended that this reason was a pretext for age or disability discrimination. <u>Id.</u> at 65. The Court of Appeals for the Third Circuit held that the employee presented sufficient evidence to cast doubt on the employer's stated nondiscriminatory reason for his termination to create a material

issue of fact.  <u>Id.</u> at 66.  The employer argued the employee's final performance evaluation demonstrated his substandard performance.  The employee noted, however, that the evaluation was unsigned and undated, and his supervisor admitted the evaluation was never presented to the employee.  <u>Id.</u>  The employer additionally argued that a March 1993 memorandum detailing several reasons why the employee was not "the right person to lead" the employer in the future supported its nondiscriminatory reason.  The employee contended that the memorandum was prepared as an after-the-fact justification, because it was written at the direction of the employer's human resources office after the termination decision was made.  <u>Id.</u> at 67.  To support his arguments, the employee also presented depositions of subordinates who portrayed his performance in a positive light.  Based upon the evidence of record, the court of appeals held that a reasonable jury could infer that the employer did not act for a nondiscriminatory reason. <u>Id.</u>

The court agrees with plaintiff that evidence supporting a conclusion that the employer's alleged nondiscriminatory reason was a post hoc fabrication is relevant to the pretext inquiry under <u>Fuentes</u>.  Plaintiff presented evidence that A. Kennedy's statement, which defendant relied upon in making its decisions, was not actually expressed.  The evidence contradicting the statement of A. Kennedy to Dodson supports a finding that defendant was not truly motivated by its alleged reasoning.  Similarly, the evidence that defendant requested Hills to solicit others with complaints against plaintiff supports a finding that its legitimate, nondiscriminatory reason was a post hoc fabrication.  Plaintiff presented evidence that defendant commenced the investigation that resulted in the collection of evidence to support its legitimate, nondiscriminatory reason almost immediately after Pellegrini demanded defendant fire plaintiff.

Plaintiff argues that the nature of her sexual harassment complaints and the disposition of those complaints is evidence discrediting defendant's alleged nondiscriminatory reason. In 2005, plaintiff complained on behalf of two nurses that alleged Dr. Pellegrini inappropriately touched them. Mignogna investigated the complaint, but failed to speak with Pellegrini. Although Mignogna reported the allegations to Pellegrini's superiors, Mignogna testified that in twenty years he could not recall another reported incident of sexual harassment in which he did not speak with the alleged accuser. With respect to plaintiff's 2006 complaint, no one informed Pellegrini that a complaint had been filed until J. Kennedy, an alleged victim, approached him.

In <u>Glass v. Philadelphia Electric Co.</u>, 34 F.3d 188 (3d Cir. 1994), an employee brought race and age discrimination actions and a retaliation action against his employer. At trial, the district court excluded the employee's evidence that would show he was the victim of harassment and show management's failure to take corrective action when it learned about the harassment. <u>Id.</u> at 192-95. The Court of Appeals for the Third Circuit found that the district court erred in excluding the evidence, since the evidence should have been admitted as proof of pretext and intentional discrimination. <u>Id.</u> at 195. The Court of Appeals for the Third Circuit cited with approval <u>Hawkins v. Hennepin Technical Center</u>, 900 F.2d 153 (8th Cir. 1990), in which the Court of Appeals for the Eighth Circuit found that evidence of harassment complaints and the disposition of those complaints was highly relevant because "an atmosphere of condoned sexual harassment in a workplace increases the likelihood of retaliation for complaints in individual cases." <u>Hawkins</u>, 900 F.2d at 156.

Mignogna contends he did not speak to Pellegrini because he was not an employee of defendant, and a jury may find Mignogna's testimony credible. The evidence that Mignogna spoke with the alleged accuser in other instances of alleged sexual harassment, but not after

plaintiff's complaints, however, supports a finding that defendant tolerated Pellegrini's actions. Such evidence raises doubts about defendant's nondiscriminatory reason, especially in light of Pellegrini's demand that plaintiff be fired after learning she filed the 2006 complaint and considering Pellegrini was one of defendant's highest dollar-volume admitting physicians and possessed strong influence.

Here, plaintiff produced evidence that a statement defendant relied upon in making its decision was never made, that defendant asked Hills to find other nurses with complaints against plaintiff on the day Pellegrini demanded she be fired, that plaintiff was placed on an action plan that required plaintiff to demonstrate improvement after defendant expressed its desire to terminate her employment, and that her complaints of sexual harassment by Pellegrini were not investigated in the same manner as other sexual harassment complaints. The court views all plaintiff's arguments together. See Snooks v. Duquense Light Co., No. 08-1689, 2009 WL 449154, at *4-5 (3d Cir. Feb. 24, 2009) (holding the district court erred "by parsing each issue [raised under the first prong of Fuentes] rather than reviewing the record in its entirety," and by failing to examine all the plaintiff's arguments together as a whole). In light of all the evidence proffered by plaintiff as demonstrative of pretext and recognizing that all disputed facts must be viewed in the light most favorable to her and all reasonable inferences must be drawn in her favor, plaintiff adduced sufficient evidence for a reasonable fact finder to conclude defendant acted with retaliatory intent.

### 2.     Prong Two

Because plaintiff presented sufficient evidence under prong one of the Fuentes test to discredit defendant's proffered reason for plaintiff's termination, the court need not address the second prong.

*Conclusion*

After considering the undisputed material facts of record, viewing all disputed facts in favor of the nonmoving party, and drawing all reasonable inferences in favor of the nonmoving party, the renewed motion for summary is granted in part and denied in part for the above stated reasons. With respect to plaintiff's gender discrimination claims under Title VII and the PHRA (counts two and three), defendant's motion for summary judgment is granted. With respect to plaintiff's Title VII and PHRA retaliation claims (counts one and three), defendant's motion for summary judgment is denied.

By the court:
/s/ JOY FLOWERS CONTI
Joy Flowers Conti
United States District Judge

Dated: March 13, 2009